(No. 66788.—
(No. 67035.—

GERILL CORPORATION *et al.*, Appellants and Cross-Appellees, v. JACK L. HARGROVE BUILDERS, INC., *et al.*, Appellees and Cross-Appellants.

*Opinion filed March 29, 1989.—Rehearing denied May 26, 1989.*

Michael A. Braun and Ira N. Helfgot, of Chicago

(Braun & Rivkin, Ltd., of counsel), for appellants and cross-appellees.

John T. McGarry, of Chicago, for appellee John F. Rosch, and John F. Rosch, of Glen Ellyn, *pro se*.

Ross & Hardies, of Chicago (Michael H. King, Alexander R. Domanskis and Joshua M. Levin, of counsel), for appellees and cross-appellants.

JUSTICE CLARK delivered the opinion of the court:

This appeal arises out of a judgment of the circuit court of Du Page County against appellees and cross-appellants, Jack L. Hargrove Builders, Inc., and its president and majority shareholder, Jack L. Hargrove (hereinafter referred to collectively as Hargrove), awarding damages to appellee John F. Rosch for Hargrove's fraudulent misrepresentations. Following the judgment, the circuit court dismissed Hargrove's third-party complaint, which sought contribution under the Illinois Contribution Among Joint Tortfeasors Act (the Contribution Act) (Ill. Rev. Stat. 1987, ch. 70, par. 301 *et seq.*) from appellants and cross-appellees, Gerill Corporation and its president and majority shareholder, Gerald A. Heinz. The court dismissed the complaint, holding that intentional tortfeasors are not entitled to contribution under the Contribution Act. The appellate court affirmed the circuit court's decision finding Hargrove liable for fraudulent misrepresentation, but reversed the dismissal of Hargrove's third-party complaint, holding that intentional tortfeasors can receive contribution under the Contribution Act. 165 Ill. App. 3d 1160 (unpublished order under Supreme Court Rule 23).

Gerill and Heinz subsequently filed a petition for leave to appeal (No. 66788) to challenge the appellate court's holding that intentional tortfeasors are entitled to contribution under the Contribution Act. Hargrove

filed a separate petition for leave to appeal (No. 67035) raising questions, which we set out in detail below, about a number of the circuit court's evidentiary and procedural findings. We granted and consolidated both petitions. (107 Ill. 2d R. 315.) As discussed below, we reverse the appellate court's holding with respect to the Contribution Act and affirm its decision upholding the rest of the circuit court's findings.

## FACTUAL BACKGROUND

In 1976, Heinz and Hargrove orally agreed that their corporations, Gerill Corporation and Jack L. Hargrove Builders, Inc., would form a joint venture to develop approximately 110 acres of land owned by Gerill in Woodridge, Illinois (the Woodridge properties). Gerill contributed the land and Hargrove managed the development and construction on the land, maintained the joint venture's records and books, and handled its financial affairs. Hargrove also obtained a $352,000 loan in 1978 from the Concordia Federal Savings and Loan Association (the Concordia loan) and then loaned $290,000 to the joint venture to pay off a mortgage held by the Glen Ellyn Savings & Loan Association on a parcel of land in the Woodridge properties.

In December 1980, Hargrove decided that due to the state of the economy at that time, it was unfeasible to continue developing the Woodridge properties as a joint venture. He thus proposed to Heinz that one partner buy out the other's interest in the joint venture. Heinz asked Hargrove to prepare a list of the joint venture's outstanding loans and open invoices, which Hargrove did in January 1981 by giving Heinz a 19-page handwritten list.

Heinz realized that he did not have enough money to purchase Hargrove's interest and so he then approached John Rosch, the president of the Glen Ellyn Savings &

Loan Association and an attorney who had represented Gerill and Heinz, with the proposition that Rosch purchase Hargrove's interest in the joint venture. There is a conflict in the evidence as to whether it was Heinz's or Hargrove's idea to approach Rosch. Heinz gave Rosch the 19-page list of loans and open invoices and told him that it had been prepared by Hargrove.

Rosch, Heinz and Hargrove held a meeting on February 7, 1981, after which Rosch prepared a draft contract that Hargrove subsequently refused to sign. A new contract was then prepared (the evidence is unclear as to by whom) which provided that Rosch would purchase Hargrove's interest for $200,000. The contract specified:

> "[T]hat to the best of Jack L. Hargrove Builders, Inc. and Jack L. Hargrove individually's knowledge, they have advised the Gerill Corporation, Gerald A. Heinz and John F. Rosch of any and all open invoices and any and all liabilities in the form of monies due and owing on the properties."

Furthermore, the contract provided that Rosch, Gerill and Heinz would "assume all liabilities and responsibilities for the Woodridge properties and \*\*\* hold [Hargrove] harmless and indemnify same from any and all debts, liabilities and claims of every kind and nature which may arise in reference to said Woodridge properties."

On March 1, 1981, the parties met to sign the contract. Rosch and Heinz testified that Rosch asked Hargrove if the 19 handwritten pages "contain[ed] all of the debts that relate to the Woodridge properties," to which Hargrove replied "Yes, they do." Hargrove denies that Rosch asked him any such question. The parties then signed the contract and on the next day Rosch paid Hargrove the $200,000.

Rosch hired an accountant, Daniel Gilmartin, to review the joint venture's books and records and to assist

in their transfer from Hargrove to Rosch. After several months, Gilmartin and Rosch discovered that the joint venture's liabilities were greater than those included in the 19-page handwritten list that had been prepared by Hargrove. A number of liabilities relating to the Woodridge properties had either been omitted from the list or misstated.

## PROCEDURAL HISTORY

On November 15, 1982, Rosch, Gerill and Heinz filed a four-count complaint against Hargrove in the circuit court of Du Page County seeking an accounting from Hargrove for Gerill and Heinz, a declaratory judgment for Rosch, and actual and punitive damages for Rosch, Gerill and Heinz from Hargrove for fraudulent misrepresentation of the joint venture's liabilities. Following various motions and amendments, Rosch, Gerill and Heinz filed two separate complaints: Rosch alleging fraudulent misrepresentation and Gerill and Heinz seeking an accounting. The accounting claim has since been severed from the rest of the case.

On November 18, 1982, Hargrove filed an eight (subsequently amended to nine) count complaint against Rosch, Gerill, Heinz, the Trust Company of Glen Ellyn, and the Beverly Bank in the circuit court of Cook County (both the Trust Company and the Beverly Bank were eventually dismissed from the case). The complaint was transferred to the circuit court of Du Page County, where it was consolidated with the case previously filed by Rosch, Gerill and Heinz. Soon thereafter, the circuit court dismissed six of the complaint's nine counts. Hargrove then filed a 10-count second amended complaint on September 6, 1983.

The first three counts of Hargrove's second amended complaint involved Hargrove's claim that under the March 1, 1981, contract, which effectuated the transfer

of Hargrove's interest in the joint venture, Rosch, Gerill and Heinz were obligated to pay off the $352,000 loan which Hargrove had taken out from the Concordia Federal Savings and Loan Association. In counts I and II, Hargrove sought injunctive relief to require Rosch, Gerill and Heinz to continue making payments on the loan to prevent a mortgage foreclosure action from being brought against Hargrove during the proceedings and an order for specific performance requiring them to assume the mortgage or provide an irrevocable letter of credit for the loan at Concordia. Count III sought the same relief based upon a claimed "Conspiracy to Defraud." Count IV sought to prevent or rescind certain allegedly fraudulent conveyances by Rosch, Gerill and Heinz of their interest in the Woodridge properties without sufficient consideration "contrary to the rights of Hargrove *** and contrary to the obligations of Heinz to Hargrove." Counts V and VI sought $30,000 in damages based upon breach of contract and promissory estoppel arguments arising out of an alleged default by Rosch, Gerill and Heinz in repaying an alleged $50,000 loan made to them by Hargrove. Counts VII and VIII were also based upon breach and estoppel arguments concerning an alleged agreement between Rosch, Gerill, Heinz, and an architect who worked on the Woodridge properties. Count IX sought rescission of the March 1 contract and restitution from Rosch, Gerill and Heinz. Count X was an action for contribution from Gerill and Heinz in the event Hargrove was found liable to Rosch for fraudulent misrepresentation.

On January 31, 1984, Hargrove brought a motion for change of venue based upon the alleged prejudice of the circuit court judge in the case. Because it was brought well after substantial issues had been ruled upon, such as the dismissal of Hargrove's first amended complaint, the judge did not grant the motion as a matter of right.

He did, however, assign the motion to another judge of the circuit court for a hearing to determine whether he, the original judge, was prejudiced. After extensive argument by both parties, it was concluded that there was no prejudice against Hargrove; the motion was denied.

Rosch, Gerill and Heinz then filed a motion to dismiss most of Hargrove's second amended complaint, which the judge granted, dismissing counts I, II, III, IV, VII, VIII, IX, and X of the complaint. In a subsequent order, the judge made the dismissal of counts I, II, III, IV, IX and X with prejudice and Hargrove was granted leave to amend counts VII and VIII. Hargrove then filed another motion for change of venue, alleging again that the judge was prejudiced. This time, the motion was granted and the case was transferred to a different judge of the circuit court of Du Page County.

On February 7, 1985, Hargrove sought leave to file an 11-count third amended complaint. Counts I through X of the complaint were very similar to counts I through X of Hargrove's second amended complaint. Count XI was a new claim for "Contractual Indemnification" arising out of the $352,000 Concordia loan. However, the judge would not grant Hargrove leave to file except for counts V through VIII. Hargrove was denied leave to file counts I through IV, IX and X because those counts had previously been dismissed with prejudice by the original judge in the case. Count XI of the third amended complaint was denied with leave to replead because the new judge in the case found it to be illogical on its face. In a later order, Hargrove was granted leave to file counts I and IX against Rosch because the original judge's order had dismissed those counts only as to Gerill and Heinz, not as to Rosch.

Soon thereafter, Hargrove repled a count for contractual indemnification by adding a count XII to its third amended complaint. On September 19, 1985, Hargrove's

counts I, VI and IX were dismissed without leave to replead, and count XII was dismissed with leave to replead one final time for breach of contract arising out of the Concordia loan. Count VIII of the complaint was later dismissed. Hargrove subsequently filed an amended count XIII for contractual indemnification and breach of contract.

In September 1986, both Rosch (joined by Gerill and Heinz) and Hargrove filed cross-motions for summary judgment on count XIII of Hargrove's complaint. Hargrove's response to Rosch's motion consisted entirely of its responsive pleading: no affidavits or evidence of any type were attached. At the hearing on the motions for summary judgment, Hargrove attempted to support its response to Rosch's motion by using exhibits attached to Hargrove's motion for summary judgment. In ruling on Rosch's motion, however, the trial court judge would only consider matters included in or with Rosch's motion and Hargrove's response to Rosch's motion: she would not consider matters raised in Hargrove's separate motion for summary judgment. Accordingly, Rosch's motion for summary judgment was granted because Hargrove failed to present any evidence of an indemnity running to Hargrove in relation to the Concordia loan. Hargrove later filed a motion to reconsider the summary judgment order, which the trial court denied, stating:

"Hargrove had ample time to gather evidence and prepare for the September 26, 1986 hearing on the motion for summary judgment.

The question at issue was whether [Hargrove] had any liability on a $352,000 Concordia mortgage undertaken by Beverly State Bank as Trustee and had made any payments on it for which counterdefendants had failed to indemnify them. Any payments made would be a matter particularly within the knowledge of Hargrove.

Yet Hargrove submitted nothing raising a question of fact on the issue either in response to the motion or in

support of Hargrove's cross motion. Hargrove now fails to show that by exercising even a pedestrian level of diligence it could not have submitted whatever else it desired to put before the court on the issue at the time the motion was heard."

The case went to trial on September 29, 1986, on Rosch's claim of intentional misrepresentation and Hargrove's $30,000 counterclaim arising out of its alleged $50,000 loan to Rosch, Gerill and Heinz. It is not clear from the record what became of count VII of Hargrove's complaint, which alleged a breach of contract arising out of an agreement with an architect who worked on the Woodridge properties. After a 17-day bench trial, the court found that Hargrove intentionally misrepresented the liabilities of the joint venture in an amount over $1.1 million. However, the court determined that Rosch was not justified in relying on some of the misrepresentations and so reduced the amount to almost $300,000, which was then reduced to $148,799.69 to reflect Rosch's one-half interest in the joint venture. The court also ruled against Hargrove on Hargrove's counterclaim for $30,000.

During the course of the trial, Hargrove was granted leave to file a third-party complaint for contribution under the Illinois Contribution Act (Ill. Rev. Stat. 1987, ch. 70, par. 301 *et seq.*) against Gerill and Heinz based upon the allegedly fraudulent misrepresentations they made to Rosch. Hargrove, apparently without leave of the court, subsequently filed a two-count amended third-party complaint for contribution based upon Gerill and Heinz's either fraudulent (count I) or negligent (count II) misrepresentations. Gerill and Heinz then filed a motion to dismiss Hargrove's amended third-party complaint pursuant to section 2—619 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—619).

The hearing on Gerill and Heinz's motion to dismiss was held after judgment had been entered in the case for Rosch. At the hearing, the court allowed Hargrove to argue both its fraudulent and negligent misrepresentation theories, without objection by Gerill and Heinz, even though the negligence count had been filed without leave of court. On February 13, 1987, the trial court dismissed both counts of Hargrove's complaint. The dismissal of count I was based upon the first district's holding in *Bresland v. Ideal Roller & Graphics Co.* (1st Dist. 1986), 150 Ill. App. 3d 445, that intentional tortfeasors have no right to contribution under the Contribution Act. Count II was dismissed because the trial court found that "[t]he evidence show[ed] that Gerill and Heinz were not in the business of supplying information for the guidance of others in their business transaction. Consequently, an element of negligent misrepresentation is missing." The trial judge, "[i]n the interests of having substance prevail over form or a dispute on procedure," also found alternatively that "[i]f the claim were submitted on the merits, [her] judgment would be for [Gerill and Heinz] on both theories" because the evidence failed to show that Gerill and Heinz were either "in the business of supplying information for the guidance of others in their business transactions," or that they "made any intentional misrepresentation to [Rosch] or did anything pertinent other than to pass along to [Rosch] the intentional misrepresentations of Hargrove."

The appellate court affirmed all of the trial court's rulings except for its dismissal of Hargrove's third-party complaint for contribution. (165 Ill. App. 3d 1160 (unpublished order under Supreme Court Rule 23).) The court recognized that there was a conflict among the appellate districts on the contribution issue: the second district, in *Dovin v. Winfield Township* (2d Dist. 1987), 164 Ill. App. 3d 326, had found that intentional tortfeasors have

a right to contribution under the Contribution Act, while the first district, in *Bresland v. Ideal Roller & Graphics Co.* (1st Dist. 1986), 150 Ill. App. 3d 445, had concluded that no such right exists. The court also noted that the fifth district, in *Pipes v. American Logging Tool Corp.* (5th Dist. 1985), 139 Ill. App. 3d 269, had held that willful and wanton tortfeasors are entitled to contribution. Following its earlier decision in *Dovin*, the appellate court below held that intentional tortfeasors are entitled to contribution and so reversed the circuit court's dismissal of count I of Hargrove's complaint. The court also determined "that the trial court erred in determining controverted facts and dismissing count II of the complaint pursuant to a section 2—619 motion." Accordingly, the case was remanded to the circuit court to consider the merits of Hargrove's contribution claim. We then granted and consolidated Gerill and Heinz's and Hargrove's petitions for leave to appeal.

### HARGROVE'S APPEAL NO. 67035

In its appeal, Hargrove claims that the appellate court was wrong in affirming the circuit court's:

(1) finding that Hargrove fraudulently misrepresented the joint venture's liabilities;

(2) finding for Rosch, Gerill and Heinz on Hargrove's counterclaim for $30,000;

(3) dismissal of most of Hargrove's third amended complaint;

(4) granting of summary judgment for Rosch, Gerill and Heinz on count XIII of Hargrove's third amended complaint; and

(5) allowing Rosch to appear as an attorney for himself and with co-counsel during trial.

We begin our analysis of Hargrove's claims by recognizing that a trial court's determination that the ele-

ments for fraudulent misrepresentation have been established is a factual one. As such, it will not be disturbed unless it is contrary to the manifest weight of the evidence. (*W.E. Erickson Construction, Inc. v. Congress-Kenilworth Corp.* (1986), 115 Ill. 2d 119, 127; *Brown v. Broadway Perryville Lumber Co.* (1987), 156 Ill. App. 3d 16, 23.) The elements of the tort of fraudulent misrepresentation are:

> "(1) [a] false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in [justifiable] reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286.

Hargrove first argues that the circuit court incorrectly concluded that Hargrove made untrue statements. It is undisputed, however, that certain liabilities of the joint venture were either misstated or omitted from the 19-page list. Furthermore, both Rosch and Heinz testified that immediately prior to signing the March 1, 1981, contract, Hargrove answered "yes" when Rosch asked if the 19-page list was a complete list of the joint venture's liabilities. Accordingly, we will not overturn the circuit court's findings.

Hargrove further maintains that even if misrepresentations were made, Hargrove made them without actually knowing that they were false and so cannot be held liable for fraudulent misrepresentation. However, it is well established that a misrepresentation is fraudulent either where a party makes the representation knowing it is false *or* where the misrepresentation was made with a reckless disregard for its truth or falsity. (See *McMeen v. Whipple* (1961), 23 Ill. 2d 352, 355; *Buechin v. Ogden Chrysler-Plymouth, Inc.* (1987), 159 Ill. App. 3d 237, 247; W. Prosser & W. Keeton, Torts §107, at 741-42 (5th

ed. 1984).) In this case, the court, based upon evidence submitted by Rosch, found that Hargrove misrepresented the joint venture's liabilities by about $1.1 million. Even though Hargrove claims this misrepresentation was due to inadvertence, our review of the record indicates that it was reasonable for the circuit court to conclude that Hargrove, the party with exclusive control of the joint venture's books, records and financial affairs, either knowingly misrepresented the liabilities of the joint venture, or did so with a reckless disregard for whether the representations were truthful.

Hargrove next argues that Rosch did not have a right to rely upon Hargrove's misrepresentations; *i.e.*, that Rosch's reliance was unjustified. Hargrove claims that Rosch had no right to rely on the misrepresentations because Rosch could have made an effort to examine the joint venture's records himself to verify Hargrove's representations.

In addressing the issue of reliance, the circuit court disallowed recovery for over $800,000 of the almost $1.1 million in liabilities that it found Hargrove had misrepresented because the court found that Rosch's reliance was unjustified. The disallowed items were taxes, mortgages and loans whose existence, the circuit court concluded, could have been ascertained by Rosch through reasonable and prudent diligence. The recoverable items consisted of bills for construction work and supplies, and damages arising out of a lawsuit that had been filed against the joint venture in Cook County. In allowing recovery, the circuit court explained:

> "Considering that Mr. Rosch was coming into a joint venture that had been conducted for years without any written agreement, with Mr. Hargrove having almost autonomous charge of authorizing payment for construction work and other services rendered to the venture, Mr. Rosch was justified in relying upon Mr. Hargrove's repre-

sentation as to this type of liability. These kinds of liabilities fluctuate and are difficult to verify at any point in time, let alone to identify at all."

We find that the circuit court's reasoning is supported by the record in this case and is consistent with the rule that one is justified in relying upon the representations of another, without independent investigation, where the person to whom the representations are made does not have the same ability to discover the truth as the person making the representations. (*Bundesen v. Lewis* (1938), 368 Ill. 623, 633; *Glazewski v. Allstate Insurance Co.* (1984), 126 Ill. App. 3d 401, 408, *rev'd in part on other grounds* (1985), 108 Ill. 2d 243; 37 C.J.S. *Fraud* §34, at 279 (1943).) In this case, the existence of the Cook County lawsuit and information regarding the joint venture's construction costs, unlike taxes, mortgages and loans, were matters almost exclusively within the knowledge of Hargrove and it would have been difficult, if not impossible, for Rosch to discover them.

We also agree with the circuit court's finding that Rosch relied upon Hargrove's misrepresentations. Rosch testified that he used the 19-page list of liabilities to assess the value of the joint venture, that they were the only records he reviewed to determine the joint venture's liabilities, and that he relied upon them in deciding to purchase Hargrove's interest in the joint venture. Nothing in the record compels a contrary conclusion.

Hargrove's final argument with respect to the fraudulent misrepresentation claim is that the circuit court's computation of damages was incorrect. Hargrove claims that under the benefit-of-the-bargain rule, damages for fraudulent misrepresentation must be based upon the amount of money the plaintiff paid as a result of the misrepresentation. Thus, Hargrove argues, the circuit court should not have excluded evidence that the misrepresented liabilities were either never paid or were not

paid until after Rosch sold his interest in the joint venture. We disagree.

Under the benefit-of-the-bargain rule, which governs the damage computations in ·fraudulent misrepresentation cases, damages are determined by assessing the difference between the actual value of the property sold and the value the property would have had if the representations had been true. (*Hicks v. Deemer* (1900), 187 Ill. 164, 170; *Munjal v. Baird & Warner, Inc.* (1985), 138 Ill. App. 3d 172, 186-87; *Kinsey v. Scott* (1984), 124 Ill. App. 3d 329, 341.) In this case, it was found that Hargrove represented the joint venture's liabilities as being less than they actually were. The proper measure of damages under the benefit-of-the-bargain rule, then, and the formula that was used by the circuit court, was the difference between the joint venture's liabilities as misrepresented by Hargrove and what those liabilities actually were. How Rosch or the joint venture subsequently dealt with those liabilities was irrelevant to this determination. Our review of the record also convinces us that the results arrived at by the circuit court in applying the benefit-of-the-bargain rule were amply supported by the evidence.

We similarly find no merit in Hargrove's argument that the circuit court should not have denied Hargrove's counterclaim for $30,000 in damages arising out of an alleged $50,000 loan made by Hargrove to Rosch, Gerill and Heinz. Hargrove claims that he deposited the $50,000 loan into a checking account and that he used these funds to pay certain bills for Rosch, Gerill and Heinz. However, neither Rosch nor Heinz ever signed a note for the alleged loan. Similarly, the checking account was controlled by Hargrove and none of the alleged "borrowers" had access to the account. There was also evidence that the account had a negative balance exceeding $17,000 immediately prior to the deposit of the

$50,000 and that Hargrove subsequently withdrew $20,000 from the account for his own use. Furthermore, it was undisputed that Hargrove also deposited into the account over $50,000 that was actually Rosch and Heinz's money. Finally, much of the evidence in support of Hargrove's claim was the testimony of Hargrove and Hargrove's secretary, Susan Peloza, both of whose testimony the trial judge found "incredible." As a result, the trial judge concluded that there was "a noticeable lack of supporting documentation" for Hargrove's claim.

We will not overturn a trial court's evidentiary findings unless they are against the manifest weight of the evidence. (*Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356.) This is because:

> "where the testimony is contradictory, the trial judge as the trier of fact is in a position superior to a court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof." (*Schulenburg*, 37 Ill. 2d at 356.)

Upon review, we conclude that the trial court's determinations were amply supported by the record. Accordingly, we affirm the trial court's finding for Rosch, Gerill and Heinz on Hargrove's $30,000 counterclaim.

Hargrove next claims that the circuit court erred in dismissing various counts of Hargrove's third amended complaint. The second judge in the case dismissed the counts of Hargrove's complaint because the original judge had previously dismissed similar counts in Hargrove's second amended complaint with prejudice. The second judge explained that she:

> "decline[d] to exercise discretion to readjudicate orders entered by the [original judge] in view of the length of time this cause has been pending, about three years, the stage of development, the Sec. 2—615 motions in progress, and the court file reflecting that Hargrove's mo-

tion for change of venue from [the original judge] was presented after his rulings on substantive issues, had been made."

Hargrove does not challenge the original judge's order dismissing counts of the second amended complaint. Instead, Hargrove argues that the original judge's rulings should have been disregarded by the subsequent judge. In support of this argument, Hargrove cites the rule that where a judge errs in denying a petition for change of venue, any orders entered thereafter by that judge are void. (See *Board of Education v. Morton Council, West Suburban Teachers Union Local 571* (1972), 50 Ill. 2d 258, 261-62.) From this rule, Hargrove leaps to the conclusion that Hargrove somehow demonstrated that the original judge was prejudiced and so his rulings should have been disregarded. We disagree, however, because we do not believe that prejudice was ever demonstrated.

As discussed earlier, the original judge denied Hargrove's first petition for change of venue because neither he nor the judge who conducted a hearing on the issue found that there was prejudice against Hargrove. The court then dismissed most of Hargrove's second amended complaint. Eight months later, Hargrove brought another petition for change of venue, which was ultimately granted. However, the order was not based upon a showing of prejudice. Rather, the petition was granted because of justifiable exasperation by what the judge called the "unprofessional conduct" of Hargrove's attorneys in repeatedly making baseless allegations that the judge was prejudiced. Thus, prejudice on the original judge's part was never demonstrated and so the question of whether his rulings should have been followed was entirely within the subsequent judge's discretion. (See *McClain v. Illinois Central Gulf R.R. Co.* (1988), 121 Ill. 2d 278, 287.) We find no abuse of that discretion here.

The fourth argument advanced by Hargrove is that the circuit court erred in granting summary judgment for Rosch, Gerill and Heinz on Hargrove's counterclaim for contractual indemnification with regard to the $352,000 Concordia loan. Hargrove argues that the following "facts" do not support the circuit court's summary judgment order: (1) the loan was obtained to pay obligations on the Woodridge properties; (2) the joint venture treated the loan as a liability for the Woodridge properties; (3) the loan was included on the 19-page list of the joint venture's liabilities; (4) all Woodridge obligations were assumed by Rosch, Gerill and Heinz under the March 1, 1981, agreement; (5) Rosch, Gerill and Heinz paid the loan for 13 months and obtained a loan extension; (6) Rosch, Gerill and Heinz stopped paying the loan; (7) after Rosch, Gerill and Heinz stopped paying the loan, Concordia placed a claim against Hargrove for payment and then proceeded to file a foreclosure action against Hargrove, and Concordia then assigned the loan to the Intercounty Title Company of Illinois, which then filed a foreclosure action against Hargrove and continues to hold Hargrove responsible for over $450,000; and (8) Hargrove testified that his obligations on the Concordia loan have not been extinguished.

Even assuming these statements to be true, Hargrove has still failed to provide any factual basis supporting a key element of his claim for indemnity. It is clear that a cause of action on an indemnity agreement does not arise until the indemnitee either has had a judgment entered against him for damages, or has made payments or suffered actual loss. (*Fidelity & Deposit Co. v. Rosenmutter* (N.D. Ill. 1985), 614 F. Supp. 348, 351 (applying Illinois law); 42 C.J.S. *Indemnity* §14, at 588-89 (1944).) Nothing in the "facts" listed by Hargrove in its briefs before us, or in the evidence submitted to the circuit court below, indicates that Hargrove has suffered

any actual loss as a result of the Concordia loan. Nor has there been a judgment against Hargrove for damages arising out of the loan. Accordingly, the circuit court was correct in granting summary judgment against Hargrove on Hargrove's claim for indemnification.

Hargrove's final contention is that the circuit court erred in allowing Rosch to represent himself at trial while also being represented by co-counsel. According to Hargrove, the circuit court's decision is contrary to Illinois law. Hargrove supports this argument by citing a number of criminal cases in which this and other courts have stated that an accused does not have the right to both act *pro se* and be represented by counsel. See, *e.g.*, *People v. Ephraim* (1952), 411 Ill. 118, 122 ("An accused has either the right to have counsel act for him or the right to act himself. *** [I]t is obvious that both of those rights cannot be exercised at the same time"); *People v. Page* (1987), 152 Ill. App. 3d 957, 959 ("There is no right, whether by Federal or State constitution, State statute or by common law, to combine representation *pro se* and by counsel").

We have examined the cases cited by Hargrove and conclude that though a party is not entitled as a matter of right to be represented both *pro se* and by counsel, it is within a trial court judge's discretion to allow such dual representation. Our view is in accord with the opinions of Federal and State courts that have considered the issue. (See, *e.g.*, *O'Reilly v. New York Times Co.* (2d Cir. 1982), 692 F.2d 863, 868; *United States v. Hill* (10th Cir. 1975), 526 F.2d 1019, 1024; *State v. Cannon* (Ariz. App. 1980), 127 Ariz. 147, 149, 618 P.2d 641, 643; *Hooks v. State* (Del. 1980), 416 A.2d 189, 198; *Wallace v. State* (1977), 267 Ind. 43, 45, 366 N.E.2d 1176, 1177; *State v. Ames* (1977), 222 Kan. 88, 101, 563 P.2d 1034, 1045; *Callahan v. State* (1976), 30 Md. App. 628, 634, 354 A.2d

191, 194; *State v. Velanti* (Mo. 1960), 331 S.W.2d 542, 546; *State v. McCleary* (1977), 149 N.J. Super. 77, 80, 373 A.2d 400, 401.) Based upon our review of the record, we hold that the trial court judge did not abuse her discretion in allowing Rosch to both act as his own attorney and be represented by co-counsel.

## GERILL AND HEINZ'S APPEAL NO. 66788

We turn now to the question raised by Gerill and Heinz of whether intentional tortfeasors are entitled to contribution under the Illinois Contribution Among Joint Tortfeasors Act (Ill. Rev. Stat. 1987, ch. 70, par. 301 *et seq.*). This question of statutory interpretation has divided the districts of the appellate court in this State. (See *Dovin v. Winfield Township* (2d Dist. 1987), 164 Ill. App. 3d 326, 344 (intentional tortfeasors are entitled to contribution); *Bresland v. Ideal Roller & Graphics Co.* (1st Dist. 1986), 150 Ill. App. 3d 445, 456 (intentional tortfeasors are not entitled to contribution); see also *Pipes v. American Logging Tool Corp.* (5th Dist. 1985), 139 Ill. App. 3d 269, 274 (willful and wanton tortfeasors are entitled to contribution).) To answer, we must determine the General Assembly's intent in enacting the Contribution Act.

Hargrove argues that the intent of the legislature can be ascertained by the language of the Contribution Act itself. Where the language of a statute "is unambiguous, a court must enforce the law as enacted without considering other aids." (*County of Du Page v. Graham, Anderson, Probst & White, Inc.* (1985), 109 Ill. 2d 143, 151.) The Contribution Act provides, in part:

"§2. Right of Contribution. (a) Except as otherwise provided in this Act, where 2 or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death, there is a right of contribution among them, even though judgment has

not been entered against any or all of them." (Ill. Rev. Stat. 1987, ch. 70, par. 302.)

The statute does not differentiate between intentional and nonintentional torts or tortfeasors. Nor does the statute explicitly limit itself to nonintentional torts. Instead, it uses the terms "persons liable in tort" and "tortfeasors." Hargrove asserts that the word "tort" is normally and popularly understood to include both intentional and nonintentional torts, and so Hargrove claims that the statute's language clearly provides intentional tortfeasors with a right to contribution. We disagree, however, because we find that the meaning of the term "tort" is ambiguous.

Although phrases like "negligent tort" and "intentional tort" are fairly susceptible to definition, the meaning of the term "tort," by itself, is not so clear. As Prosser stated in his treatise on torts:

"[A] really satisfactory definition of a tort is yet to be found. The numerous attempts which have been made to define the term have succeeded only in achieving language so broad that it includes other matters than torts, or else so narrow that it leaves out some torts themselves." (W. Prosser & W. Keeton, Torts §1, at 1-2 (5th ed. 1984).)

Similarly, Wigmore stated that "Never did a Name so obstruct a true understanding of the Thing. To such a plight has it brought us that a favorite mode of defining a Tort is to declare merely that it is not a Contract." (1 J. Wigmore, Select Cases on the Law of Torts, at vii (1912), quoted in W. Prosser & W. Keeton, Torts §1, at 2 n.3 (5th ed. 1984).) One such ambiguous statement was this court's definition of a tort as " 'an act or omission giving rise, in virtue of the common law jurisdiction of the court, to a civil remedy which is not an action of contract.' " (*Morris v. Jamieson* (1903), 205 Ill. 87, 105, quoting F. Pollock, Law of Torts 4.) Clearly, the prob-

lems courts and commentators have had in defining the term indicate that the meaning of the word "tort" is ambiguous. Due to this ambiguity, it is appropriate for us to look to the legislative history of the Contribution Act to aid in determining the General Assembly's intent. *People v. Boykin* (1983), 94 Ill. 2d 138, 141.

This court has frequently noted that the General Assembly enacted the Contribution Act to codify the decision in *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, in which this court discarded the no-contribution-among-tortfeasors rule. (See, *e.g.*, *Doyle v. Rhodes* (1984), 101 Ill. 2d 1, 8-9; *Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 126; *Stephens v. McBride* (1983), 97 Ill. 2d 515, 521-22.) As a result, an examination of the opinion in *Skinner* is appropriate to help ascertain whether the General Assembly intended to create a right of contribution for intentional tortfeasors.

In *Skinner*, this court held that a defendant in a strict liability action could maintain a cause of action against a third party for contribution. (*Skinner*, 70 Ill. 2d at 16.) Before *Skinner*, tortfeasors were not entitled to contribution in Illinois. The origin of this rule was the English case of *Merryweather v. Nixan* (K.B. 1799), 101 Eng. Rep. 1337. However, as this court explained in *Skinner*, *Merryweather* had been misapplied by the great majority of American courts, including Illinois courts, to stand for a rule prohibiting contribution for all tortfeasors. What *Merryweather* actually held was that there is no right to contribution for *intentional* tortfeasors. *Merryweather* did not change the general rule that nonintentional tortfeasors were entitled to contribution. (*Skinner*, 70 Ill. 2d at 8-9.) Thus, this court concluded in *Skinner* "that there is no valid reason for the continued existence of the no-contribution rule." *Skinner*, 70 Ill. 2d at 13.

One justice who dissented from the majority opinion in *Skinner* noted that though the majority's discussion of *Merryweather* suggested that the rule against contribution was still in force for intentional tortfeasors, the majority did not make this explicit. Consequently, the dissent found it necessary to "state clearly that it is being retained." *Skinner*, 70 Ill. 2d at 19 (Ward, C.J., dissenting).

Hargrove incorrectly interprets the decision in *Skinner* as abolishing the no-contribution rule for all tortfeasors. *Skinner* held only that a right of contribution exists for a defendant in a strict liability action. The issue of whether contribution exists for intentional tortfeasors was not before the court and therefore was not addressed. However, as noted by the dissent in *Skinner*, the majority's reliance on the *Merryweather* decision, which held that intentional tortfeasors were not entitled to contribution, indicates that the no-contribution rule for intentional tortfeasors was being retained.

Our reading of the *Skinner* decision is consistent with the General Assembly's reading of the case prior to enacting the Contribution Act. Nothing in the legislative history of the Contribution Act indicates that the General Assembly, in codifying the *Skinner* decision, intended to create a right of contribution for intentional tortfeasors. Instead, statements made during the floor debates by both the Senate and House sponsors of the bill that was to become the Contribution Act demonstrate that the statute was meant to create a right of contribution for negligent tortfeasors. Senator Berman stated:

> "This is a bill that addresses a problem that arose from a Supreme Court decision known as the Skinner case. Skinner versus Reed Prentice in which the question of the obligation of different defendants in a tort action...*negligence* action would be resolved." (Emphasis added.) (81st

Ill. Gen. Assem., Senate Proceedings, May 14, 1979, at 173.)

Similarly, Representative Daniels explained:

"When you have people that are responsible for monetary damages and there's more than one person and they have been *negligent* resulting in a judgment entered against more than one person, they are called joint tortfeasors. What this Bill says is that they should be responsible to pay their prorata [*sic*] share, and if this has not occurred, that the parties between themselves may have an action. Now, this is a result of the Skinner versus Reed decision handed down by the Illinois Supreme Court." (Emphasis added.) 81st Ill. Gen. Assem., House Proceedings, June 14, 1979, at 22.

Hargrove argues that the Senate indicated an intent to include intentional tortfeasors in the Contribution Act by deleting a clause from the original bill that would have expressly excluded a "right of contribution in favor of any tortfeasor who has intentionally either caused or contributed to the injury or wrongful death." (See Committee Amendment I to Senate Bill 308.) We note initially that this is not a case where the full Senate deleted statutory language after full debate on the Senate floor. Instead, the language here was deleted by the Senate Judiciary Committee and the deleting amendment was adopted without discussion by the full Senate before the bill went to the House. As a result, no record containing information as to why the clause was deleted exists. It could be, contrary to Hargrove's assertion, that the clause was originally drafted in response to the dissent in *Skinner* and deleted only to align the bill closer to the majority's opinion, which was also silent on the matter. Whatever the case may be, we will not engage in speculation to determine the legislature's intent in deleting the clause. Accordingly, we are not persuaded that the deletion of the clause regarding . intentional tortfeasors, without any indication as to why it was deleted,

is in any way indicative of the General Assembly's intent. See *Rastelli v. Warden, Metropolitan Correctional Center* (2d Cir. 1986), 782 F.2d 17, 24 n.3; *Maiter v. Chicago Board of Education* (1980), 82 Ill. 2d 373, 385.

We conclude, therefore, that intentional tortfeasors are not entitled to contribution under the Illinois Contribution Among Joint Tortfeasors Act (Ill. Rev. Stat. 1987, ch. 70, par. 301 *et seq.*). We thus overrule the decision in *Dovin v. Winfield Township* (2d Dist. 1987), 164 Ill. App. 3d 326, which held to the contrary. We also reverse that part of the appellate court's decision that held that there is a right to contribution for intentional tortfeasors. We affirm the rest of the appellate court's decision upholding the circuit court's findings with respect to Rosch's and Hargrove's claims and counterclaims.

*No. 66788 — Appellate court reversed;*
*circuit court affirmed.*
*No. 67035 — Judgment affirmed.*

WARD and CALVO, JJ., took no part in the consideration or decision of this case.